Bernard ZOLNOWSKI, Jr.,
et al., Plaintiffs,

v.

COUNTY OF ERIE, et al., Defendants.

No. 95–CV–774A(F).

United States District Court,
W.D. New York.

Oct. 3, 1996.

Lipsitz & Ponterio (Nan Lipsitz Haynes, of counsel), Buffalo, NY, Sliwa & Lane (John A. Ziegler, of counsel), Buffalo, NY, Glenn Edward Murray, Buffalo, NY, for plaintiffs.

Kenneth P. Schoetz, Erie County Attorney, James A.W. McLeod, Second Assistant County Attorney, of counsel, Buffalo, NY, for defendants Erie County, Thomas Higgins, Sheriff of Erie County, John Dray, Superintendent of the Erie County Holding Center, Frederick Netzel, Superintendent of the Erie County Correctional Facility.

## DECISION AND ORDER

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned by order of the Hon. Richard J. Arcara entered May 15, 1996. A consent to proceed before the undersigned was filed July 12, 1996.

### BACKGROUND

This civil rights action was brought under 42 U.S.C. § 1983 initiated on September 9, 1995 when Plaintiff, Bernard J. Zolnowski, Jr., filed a pro se complaint on behalf of himself and all other persons similarly situated challenging conditions of confinement based on overcrowding at Defendants' local jail, the Erie County Holding Center, located at 10 Delaware Avenue, Buffalo, New York operated by Defendant Thomas Higgins, the Sheriff of Erie County and Defendant John Dray, Superintendent of the Holding Center and the Erie County Correctional Facility located in Alden, New York operated by the

County of Erie and supervised by Defendant Frederick Netzel, superintendent of the facility. Plaintiff also sued the New York State Commission of Corrections, a state agency responsible for the establishment and enforcement of minimum standards regulating the conditions of confinement for incarcerated persons in correctional facilities in the state. Plaintiffs seek money damages and injunctive relief based upon alleged violations of their right to due process under the Fourteenth Amendment and the protection against cruel and unusual punishments as guaranteed by the Eighth Amendment.

On October 4, 1995, Plaintiff Zolnowski, who had then been released from the jail, filed an amended complaint adding four other persons as plaintiffs, but signed only by himself, specifically alleging a class action for violation of these same constitutional rights. However, neither the complaint nor the amended complaint was served in accordance with Fed.R.Civ.P. 4(m). Later, on January 8, 1996, Zolnowski moved to certify the class as described in the amended complaint. The motion was opposed by Defendants by papers filed on June 17, 1996.

Plaintiffs, represented by counsel, moved on July 16, 1996, pursuant to Fed.R.Civ.P. 65, for a preliminary injunction and an expedited hearing. Defendants opposed the motion by papers filed July 19, 1996, and moved to dismiss for failure to state a claim and lack of personal jurisdiction based upon Plaintiffs' failure to complete service. Specifically, Defendants asserted that Plaintiffs had failed to plead a constitutional violation and were without standing to request injunctive relief in their individual capacities or as representatives of the alleged class. Defendants further moved, pursuant to Fed.R.Civ.P. 19, to add, as necessary party defendants, the New York State Division of Parole and the New York State Division of Correctional Services. The New York State Division of Parole and Division of Correctional Services opposed the County defendants' motion to add them as parties. By motion filed July 18, 1996, Defendant Commission of Corrections moved to dismiss as to itself on the ground that it was not a person subject to suit in this Section 1983 action.

In response to Defendants' motion to dismiss under Rule 4, Plaintiffs' moved on July 15, 1996 for leave, for good cause shown, to serve the complaint and amended complaint outside the prescribed 120 day period pursuant to Fed.R.Civ.P. 4(m). Plaintiffs further moved, on July 23, 1996, for leave to file a Second Amended Complaint adding as new plaintiffs two persons then being held at the jail.

At a hearing on Plaintiffs' motion for preliminary injunction on July 22, 1996, the court granted Plaintiffs' motion to serve the Complaint and First Amended Complaint beyond the 120 day period, granted the Defendant New York State Commission of Corrections' motion to dismiss, and denied the county Defendants' motion to add the New York State Division of Parole and Department of Correctional Services as parties. The court also denied the county Defendants' motion to dismiss in so far as it had contended that the Complaint and First Amended Complaint failed to state a claim, reserving decision on the questions of Plaintiffs' standing and Defendants' alternative contention that the First Amended Complaint had not been properly executed by all plaintiffs when filed and therefore was subject to dismissal for failure to comply with Fed.R.Civ.P. 11(a).

On July 26, 1996, the court orally entered its decision on the record finding that Zolnowski had standing to seek both money damages and injunctive relief as to the proposed class and that the Plaintiffs, who had not executed the First Amended Complaint, should be given an opportunity to do so. The court also held that the amended complaint was not subject to dismissal as to Plaintiff Zolnowski as he had timely executed the pleading when it was filed, and that the Defendants' motion to dismiss was therefore denied in all respects. The court further found that Plaintiffs' motion for leave to file a Second Amended Complaint should be granted provided the amended complaint was served not later than July 29, 1996, the scheduled date for the commencement of the hearing on Plaintiffs' motion for a preliminary injunction.

The court also granted Plaintiffs' motion for certification of a class finding that the

First Amended Complaint and Second Amended Complaint satisfied the requirements of Fed.R.Civ.P. 23(b)(2), and that there was no necessity at that point to provide special notice pursuant to Fed.R.Civ.P. 23(d)(2). The class certified included persons, both pre-trial detainees and sentenced prisoners, who had been in custody at the Erie County Holding Center as of September 9, 1995 and who may thereafter be in custody at the Holding Center. The court notes that its certification did not include persons confined at the Correctional Facility as Zolnowski was not at the time his complaint was filed confined in the Correctional Facility he would not have had standing to seek injunctive relief as to conditions at the Correctional Facility nor serve as a class representative for purposes for either an equitable remedy or money damages.

The hearing on the preliminary injunction was conducted over the next four days. Following the conclusion of testimony on August 2, 1996, with agreement of the parties, the court was given a tour of the Holding Center thereby enabling it to make observations of the conditions which had been described during the hearing.

In their motion, Plaintiffs' requested that the Defendants be restrained from exceeding the maximum capacities of the Erie County Correctional Facility which is 525 prisoners, and 610 prisoners for the Holding Center. Plaintiffs contend that as a result of incarcerating persons in excess of these maxima, Defendants have created a serious risk to the health and safety of members of the Plaintiff class constituting punishment for those class members who are pre-trial detainees while housed at either facility in violation of their right to due process of law under the Fourteenth Amendment, and, for those class members who are convicted persons, cruel and unusual punishment in violation of the Eighth Amendment. Although Plaintiffs' motion for preliminary relief is directed to both the Holding Center and County Correctional Facility, the evidence at the hearing provided more of a comparison of the conditions between the two facilities than a showing of any alleged inadequate conditions at the Correctional Facility. As noted, Zolnowski lacks standing to seek injunctive relief as to the Correctional Facility and none of the Plaintiffs in the Second Amended Complaint were alleged to be confined in that facility. Moreover, in plaintiffs' post-hearing proposed findings of fact and conclusions of law filed August 9, 1996, Plaintiffs requested relief only as to the Holding Center. Plaintiffs' Findings of Fact, Conclusions of Law and Preliminary Injunction filed August 9, 1996 at 13. Accordingly, the motion must be viewed as only directed against conditions in the Holding Center. Supplemental oral argument was conducted September 26, 1996. For the reasons which follow, Plaintiffs' motion for a preliminary injunction is GRANTED in part, and DENIED in part.

## FACTS [1]

At the hearing, the court received testimony from Steve Brown, a reporter and newscaster with a local television station, Channel 7, WKBW–TV, who testified about his observation of conditions at the Holding Center during a tour conducted on June 27, 1996. A video tape recording of the tour was made at that time and a copy of the tape was admitted into evidence as Plaintiffs' Exhibit A and played in court. In his testimony, and as confirmed by the video, Brown described the housing of prisoners in various areas within the Holding Center including several rooms located on the ground floor of the jail called "court hold rooms." The areas, explained in the later testimony of Superintendent Dray, were originally designed to hold prisoners while they awaited transfer to court, but the rooms are presently being used to house prisoners for various lengths of time until an individual cell became available elsewhere within the jail. The rooms are of varied dimensions ranging in size from approximately eight feet by sixteen feet for the smallest room to twenty-four feet by thirty feet for the largest, court hold room # 7. Brown testified that he saw fifteen male prisoners in court hold room # 7 lying on sleep-

1. As no transcript was ordered by the parties, the facts are based upon the court's notes, recollection of the testimony, exhibits and stipulations.

ing pads placed on the floor of the room leaving little space to move about the room a fact clearly observable on the video. The room has one toilet which is in a corner area with a bed sheet drawn across it to provide some privacy when in use. Another sequence in the video and as described by Brown shows an area, identified as the atrium, which is an area inside the jail in which both bunk beds and sleeping "mats" on the floor are used by female prisoners. In this area, about fifteen feet wide and forty-five feet long, approximately twelve bunk-beds were placed. The mats are made of coarse cotton stuffed inside of a vinyl-like material approximately two and one-half feet by four and one-half feet in size.

Brown also described the use of the jail's gymnasium which is used as a living area to house about fifty prisoners by positioning one mat for each prisoner around one-half of the outer perimeter of the basketball court in the gymnasium. There was no recreational activity going on during Brown's observations in the gym. The other one-half of the basketball court was being used as a common living area for tables and chairs where the prisoners could eat their meals, play board or card games or watch television and generally use this space for every day living. Brown testified that a deputy sheriff, who escorted Brown on the tour, told him that the observed overcrowded conditions created a difficult and stressful situation for both prisoners and staff. The deputy also told Brown that although the Holding Center staff would like to do more for the prisoners in providing better living arrangements, they were unable to do so.

The video also showed an area adjacent to one of the regular cell-blocks in which approximately thirteen persons were housed in a room measuring eighteen feet by twelve feet with about one-half of the occupants sleeping on mats; the others on bunk-beds. According to Brown, the deputy sheriff who escorted him also stated that as result of the overcrowding in the jail the prisoners' access to recreation was limited. The deputy also told Brown that it was not unusual for prisoners to be housed at the jail for two or

three days and that 848 prisoners were housed in the facility that day.

Bernard J. Zolnowski, the lead Plaintiff, also testified and described his experience at the Holding Center following his arrest on felony drunk driving charges on April 25, 1995. Zolnowski stated that after completing the standard booking procedure, he was held in one of the court hold rooms which he described as having dimensions of approximately ten feet by twenty-five feet along with fourteen other persons. Each prisoner was given one of the vinyl covered mats and a blanket for sleeping on the floor of the room. In the room there was one sink and toilet which lacked any modesty panels and was covered with a bed sheet held in place with plastic forks and spoons. According to Zolnowski, during his confinement which lasted two or three days until his subsequent transfer to the Erie County Correctional Facility, Defendant Erie County's penitentiary, the toilet in the court hold room was "filthy" and backed up at least once during his stay in the court hold room, the floor was dirty and covered with cigarette ashes, refuse from meals and dust from the blankets, and one of the other prisoners vomited in the toilet, which because of the confined area caused Zolnowski to become "physically ill." Zolnowski stated that because the benches in the room, which are attached to the walls, were themselves employed as make-shift beds by those prisoners who wished to use them in this way, the remaining prisoners had to eat their meals sitting on their sleeping mats on the floor.

Zolnowski testified that because of the lack of space in the court hold room, some of the sleeping mats had to be located approximately one foot from the toilet. Food wastes were discarded into a large plastic trash bag kept in the room which was not removed until the end of the guard's shift, meanwhile attracting or generating numerous fruit flies. As Zolnowski also testified, the bugs, when added to the strong body odors caused by the sweaty prisoners in the room and the dirty toilet and residual effects of the vomiting, created an environment unfit for the day-to-day housing of human beings. Although Zolnowski did not say there were any

other insects observed while he was in the court hold room, he did recall seeing a cockroach in a meal which was served to him when he was later assigned to a standard cell block area located elsewhere in the jail. Zolnowski stated that the court hold room (both the prisoners and jail staff commonly refer to the court hold rooms as "bull-pens") was inadequately ventilated and the prisoners were forced to sleep under bright security lights which were left on at all times. According to Zolnowski, the room lacked any outside windows, the only window being one in the hallway wall through which jail staff and other persons who may be passing through the hallway could observe the prisoners in the room.

Zolnowski further testified that on July 7, 1995, he was sentenced on a bad check charge and transferred to the Erie County Correctional Facility, as a sentenced prisoner, for seven days, at which point he was transferred back to the Holding Center as a pre-trial detainee on his original drunk driving charges, from which he was subsequently released on September 21 1995 Zolnowski compared his experience at the Holding Center to the Correctional Facility by stating that he was treated "better as a sentenced prisoner" at the Correctional Facility than he was as pretrial detainee at the Holding Center. Zolnowski was not cross-examined.

Frederick Netzel, superintendent of the Erie County Correctional Facility also testified. Netzel explained that the purpose of his facility was to incarcerate convicted persons for the service of their prescribed sentence involving less serious state felonies and local court misdemeanor convictions, and to provide temporary housing for pretrial detainees transferred from the Holding Center as well as convicted persons adjudicated as parole violators or parolees awaiting a hearing for an alleged parole violation.

Additionally, the Correctional Facility is required to provide temporary housing for persons convicted of more serious state felonies and who are awaiting transfer to a more secure state operated penitentiary. Persons awaiting such transfer, including adjudicated parole violators and convicted state felons are, according to Netzel, considered as "state ready" prisoners whom, under state law, are supposed to be transferred by the state within ten days of their arrival at the Correctional Facility. However, as Netzel also explained, because of overcrowding at New York state correctional facilities, the required timely transfers of such "state ready" prisoners is often delayed thereby contributing to the overcrowded conditions at both the Correctional Facility and Holding Center. Netzel stated that as of the day of his testimony, July 30, 1996, his facility housed 133 state ready prisoners whom had been housed there for more than the maximum ten day period. According to Plaintiffs' Exhibit O, as of August 1, 1996, of the sixty-four sentenced prisoners ready for transfer to a state prison, fifty-one had been housed at the Holding Center over ten days. Further, of the thirty-eight state parole violators held in the Holding Center as of that date, seven were over ten days.

Netzel also testified that the New York State Commission of Corrections ("the Commission") has the authority under state law to establish minimum standards for the conditions of confinement of persons in correctional facilities located within the state. According to Netzel, the Commission requires a minimum of between fifty to seventy square feet per prisoner depending upon the design of the confinement space. Plaintiffs' Exhibit D, which is a copy of the regulations as adopted by the Commission, states that the minimum living area required for an individual housing unit, *i.e.*, a jail cell designed for one person, is sixty square feet and, in the case of multiple housing, *i.e.*, areas in which individual cells are grouped around a common living area or "day room," the minimum area is to be fifty square feet of living space in the inmate's individual sleeping area or cell.

In the case of that portion of the Holding Center constructed after 1977, the original effective date of the regulations, in which the court hold rooms are located, such multiple housing areas are referred to podular units or "pods." The older areas of the Holding Center contain individual cells with toilets and sinks but without access to common areas like the pods. These areas are the linear

cell blocks or "linears." The Commission's regulations, according to Exhibit D, also require that each inmate housed in an individual cell shall have one bed and mattress, one functioning toilet and a sink. For inmates housed in a multiple living unit like the pods, the regulation requires a minimum of one toilet, shower, and sink for every eight inmates. There was no evidence presented that the linear cells or podular areas of the Holding Center are not in compliance with the Commission's regulations.

While Netzel confirmed that the regulations apply to his facility, he also explained that as a result of occasional intake of prisoners in excess of the maximum capacity established for his facility by the Commission, it is necessary to assign prisoners to areas within the facility that were not designed for housing, such as hallways. However, Netzel also testified that such extraordinary housing must be approved by the Commission by applying for and receiving a "variance" or permission from the Commission permitting the facility to deviate from an applicable regulation on a temporary basis. In such instances, Netzel assigns the affected prisoners a cot so that the prisoner is able to sleep off the floor and is more comfortable and able to "sleep better" than if required to sleep on a mat on the floor. Netzel stated that he found the practice of requiring prisoners sleep on mats placed on the floors of the court hold rooms at the Holding Center "troublesome." Netzel elaborated on this opinion by explaining that when a prisoner is given a cot for temporary sleeping he is able to place his personal belongings under it thereby avoiding the likelihood that other prisoners will trip over the items which, according to Netzel, is a cause for arguments that may escalate into fights between prisoners. However, even in such overcrowded conditions as exist at the Correctional Facility, Netzel takes steps to assure that the affected prisoners are all assigned bunk beds or cots and are able to eat their meals using a table and chair and that the security lights in the sleeping areas are dimmed at night to facilitate sleep. Netzel agreed that at times the Correctional Facility is overcrowded in that it has a population of both incarcerated persons serving sentences and persons detained awaiting trial who are temporarily housed at his facility because of overcrowding at the Holding Center.

However, Netzel also stated that the Commission has granted "variances" permitting such additional housing arrangements in response to the need to house more prisoners than the facility was designed to accommodate and that the Commission regulates any additional housing of prisoners at the facility. For example, as of the day of his testimony, the facility had 634 prisoners with an approved maximum capacity of 660 including the variances granted by the Commission. In contrast, according to Netzel, the capacity of the Facility as originally designed, was 402 persons. As Netzel explained, penal institution administrators in New York state, like himself, "cannot arbitrarily move people around" to accommodate a particular need for additional housing at a facility, rather, they have a "duty to limit housing to within what [capacity and areas within the facility] the Commission allows" including variances which may be granted by the Commission. Such variances, according to Netzel, may be granted by the Commission on a monthly or even daily basis. Netzel believes that the Commission's decision to grant variances to facilities for housing of prisoners in areas of a facility which were not originally designed for such housing on a regular basis, depends upon whether the proposed space for each prisoner to be so housed is "proper and functional" for such housing. These criteria in turn are based upon the Commission's minimum standards governing conditions of confinement.

Netzel also testified that in the Correctional Facility is free of pests. He agreed that a lack of adequate ventilation in a facility can contribute to the transmission of air-borne "diseases," a problem which, according to Netzel, does not exist at his facility. Netzel also described his facility as providing adequate recreation and religious privileges, shower facilities, medical and library services, self-improvement and job training programs for all prisoners.

By letter to the court dated August 1, 1996, Plaintiffs' Exhibit L, Netzel advised the

court that, with the exception of sixty-four inmates held in the T building at the Correctional Facility, all of the inmates sleep on bunk-beds or cots and none are housed in any area which provides less than fifty-two square feet per inmate. The T building provides 39.8 square feet per inmate in an "open bay" area.

Scott Parker testified that he had been held in the Holding Center during the week preceding the hearing on harassment charges. According to Parker, he was taken from the jail intake holding cell to one of the court hold rooms for detention awaiting court disposition of his charges or bail. Parker, who admitted having used "speed," a controlled substance the prior day nevertheless appeared credible as to the limited testimony he provided. Parker stated that the court hold room in which he was held was "overflowing" and "packed" with other male prisoners. The prisoners were given "mats" on which to sleep which, because of the large number of prisoners in the room, were placed on the floor one and one-half feet apart. The room, as described by Parker, was "filthy" with garbage on the floor of the room. The surfaces of the only toilet for the approximately eighteen persons who were then confined in the room was soiled with human waste. Although Parker's confinement lasted less than a day and one-half, he also testified that when he was given an opportunity to shower, no clean towel was provided forcing him to dry off using his own clothes. Because smoking was permitted in the room, the residual tobacco smoke combined with strong human body odor made the room "smell" and caused him "gagging" and "coughing" and to feel generally "sick." Also, as Parker testified, he was required to eat his meals on his mat which because of the crowded sleeping arrangements was located within about one foot of the toilet. Parker also complained about the temperature in the room as being as "cold as Alaska" and not being able to make a pay phone call because the phone was inoperable.

On cross-examination, Parker stated while in the court hold room he fell asleep but was awakened a couple of times by the noise of someone using the toilet and when another prisoner stepped on him. Parker agreed that he could have moved away from the toilet when someone was using it, that there were no disturbances in the room during his stay there, and that he did not formally complain about the conditions while at the jail.

John J. Dray, who has served as superintendent of the Holding Center since 1989, testified that overcrowding at the jail has been a problem since 1989. Dray explained that the maximum capacity of the jail was 541 in 1986 when the new addition to the jail, originally constructed in the 1930's, was built. The jail had also been expanded in the 1950's to provide additional housing for prisoners. This addition provided traditional individual cells adjacent to corridors or galleries, and are referred to as the "linears." The 1986 addition provides individual cells for prisoners in a cluster or podular arrangement adjacent to common living areas or "day rooms" used by the prisoners for taking their meals seated at tables which may also be used for light recreational activity such as card or board games and watching television on permanently installed television monitors. The cells in the linear section measures approximately eight feet by nine feet or about seventy-two square feet per prisoner including a toilet and sink; in the podular areas, the cells measure roughly thirteen feet by seven feet or approximately ninety-one square feet, including space for a built in toilet and sink.

Dray described the areas of the Holding Center which had been converted to use for housing prisoners as a result of the increased intake of pre-trial detainees and persons convicted of state crimes awaiting removal to state correctional facilities. Dray described the seven rooms located on the ground floor of the Holding Center called court hold rooms or, as Dray stated, "bullpens." These rooms range in size from eight feet by sixteen or eighteen feet to the largest room which measures approximately twenty-four by thirty feet. Each room has attached benches and a toilet. According to Dray, the court hold rooms were not designed for housing prisoners and, in total, now are used to house as many as fifty-six male prisoners. Prisoners are given individual mats to sleep

and eat on during their stay in the court hold rooms while awaiting reassignment to less congested areas of the jail, or to an individual cell in either one of the newer podular units or an older cell in the linear areas. Dray estimated the time prisoners, who are all pretrial detainees, are housed in the court hold rooms to vary from as short a period as twenty-four hours to as long as one week with the typical stay of between seventy-two hours to five days. Although no statistics are compiled as to the number of prisoners and the lengths of time they are held in the court hold rooms or in any other area of the jail, Dray was confident that a period of one month of housing in a court hold room for any prisoner would be rare. Dray estimated that the space between the sleeping mats, which are either twenty-eight inches by fifty-four inches or sixty-two inches in size, given to the prisoners for sleeping on the floors of the court hold rooms, was about twelve inches. He also testified that the smaller court hold rooms are used to house five prisoners each allowing approximately twenty-nine square feet for each prisoner, and the largest one fifteen prisoners for about twenty-six square feet per prisoner.

Dray testified that additional makeshift housing for prisoners was created within the Holding Center by converting several areas, originally designed for other uses, for daily housing of prisoners. Some of these areas are referred to as "day rooms" or "dorms." Other converted areas include the gymnasium, the atrium, the chapel and the resource room. On the first floor of the Holding Center (the Alpha level) in the linear section of the jail, two areas are so used. One area, the atrium, exclusively used to house female prisoners, is a light well or open space between the linear and podular sections of the jail. Another room at the end of the linear cell blocks, is a room originally designated intended to be a small inmate dining and day room. Both areas are irregular in shape but generally resemble a rectangular area truncated on an angle at one end. According to floor plans of the Holding Center prepared by the County Department of Public Works and submitted to the court by both parties as a post-hearing joint exhibit, the atrium, actually more like a corridor, measures approxi-

mately fifty-seven by fifteen feet or approximately 891 square feet. Plaintiffs' Exhibit N indicates that, at the date of the hearing the atrium housed ten female prisoners. According to Exhibit J, this area may be used to house as many as fifteen prisoners. Superintendent Dray testified that all prisoners assigned to the atrium sleep on bunk beds. Prisoners are escorted by a guard upon request to a separate toilet room located some distance away as the atrium has no toilet within it. If all fifteen bunk beds were used, the area would provide fifty-nine square feet per prisoner.

The day room dorm on the Alpha level houses fifteen prisoners, ten on bunk beds and five on floor mats. Exhibit J. A small area within the room, approximately eleven by nine feet at the end of the room, has a low partition which provides some privacy while prisoners in the day room use the toilet which is located in that space. The floor space available in the day room for sleeping and eating by the inmates measures about seventeen by thirty-one feet or 532 square feet allowing approximately thirty-five feet per prisoner. The door to this linear day room is secured at all times. Stipulation dated September 9, 1996.

The gymnasium is located on the second floor (Bravo level) of the Holding Center which, as noted, houses as many as fifty prisoners on mats laid on the floor, around half of the room's perimeter an area approximately forty-three by fifty-eight feet. An area originally designated as a special projects room now referred to as a resource room, has been also converted into another dorm is also located in this level. This irregular shaped room provides about 594 square feet, allowing about fifty-nine square feet for each of the ten inmates housed in it, Exhibit N, who sleep on the bunk beds in this room. Fifteen inmates are similarly housed in another dorm or day room on this level, which was originally designated also as an inmate dining and day room. This dorm provides approximately 655 square feet, forty-three square feet for each prisoner, and is located adjacent to the linear gallery of cells on this level. A third area on Bravo level, designed for conducting religious services, referred to

as the chapel, is an open area measuring approximately twenty feet by thirty feet or 600 square feet, allowing forty square feet for each of the fifteen prisoners who are assigned to sleep on floor mats in that area.

While not entirely clear from the Joint Exhibit floor plans, prisoners in the gymnasium, chapel and resource room all share two toilets in separate lavatory rooms, located within one hundred feet of the chapel and resource room, which are accessed by prisoners on an escorted basis. Prisoners in the atrium use a separate toilet room. According to a Joint Stipulation dated September 26, 1996, doors to the resource room, gymnasium, and chapel are locked at all times unless a guard is present to supervise and authorize movement of a prisoner. The door to the atrium is not locked except during general facility lock-down periods and when the guard assigned to this area is not present.

Temporary housing for prisoners similar to the Bravo day room or dorm is provided on the third floor of the Holding Center's linear section, or Charlie level. This room has dimensions, toilet facilities and prisoner occupancy identical to the Bravo day room and also houses fifteen prisoners, ten in bunk beds and five on mats. As a linear section day room, prisoners housed in it are locked in at all times.

On the fifth floor of the Holding Center (Echo level) at issue are two similar areas used for dorm housing. Both rooms are converted exercise areas, each measuring approximately nineteen feet by fifteen and one-half feet or approximately 238 square feet. Each houses as many as fifteen prisoners, ten on bunk beds, five on mats, providing approximately sixteen feet per prisoner. This latter area has access to a toilet facility in an adjacent single prisoner cell which was made available by removing the wall between the two rooms. As day rooms located in the podular section, all are locked down on the same schedule as individual cells—11:30 P.M.—5:30 A.M.; 6:30—7:40 A.M.; 12N—1:00 P.M.; 3:00 P.M.—3:40 P.M., or about eight hours each day.

On the sixth floor of the Holding Center, the Foxtrot and Mezzanine levels located in the new podular section of the jail, one room at one end of the gallery (Foxtrot South Day Room) provides housing for ten inmates (Exhibit N) in approximately 430 square feet or forty-three feet per prisoner. A single toilet area is located at one end of the room behind a low privacy wall. Two other rooms on this level, both originally designated for exercise, one on a lower level and one on an upper level, each provide approximately 238 square feet and are used as a dorm room for ten prisoners or twenty-four square feet, with five assigned to bunk beds and five to floor mats.

On the seventh, or Golf floor level, in the podular section, a converted area like that described in connection with the fifth (Echo) floor provides a housing arrangement similar to the Foxtrot South day room described above.

By comparison, the regulations promulgated by the Commission require a sleeping area of a minimum of sixty square feet per inmate confined in a single cell with one bed and mattress, one functioning toilet and sink. For inmates assigned to multiple occupancy units, limited to a maximum of sixty inmates, the regulations require fifty square feet per inmate for sleeping space, one toilet, shower and sink for each eight inmates and day room space adjacent to the sleeping area. Exhibit D.

The prisoners also are required to eat their meals in these rooms and prisoners in the day rooms adjacent to the linear sections of the jail—the Alpha, Bravo and Charlie levels—are in a locked down or secure mode at all times. Stipulation dated September 11, 1996.

Although Dray had advised the Commission of the necessity of using these areas for housing prisoners, Dray was not certain whether the Commission had granted formal permission to do so in a variance from Commission standards for housing prisoners. Dray stated that both the court hold and the day-rooms were not suitable for permanent housing and that he would not request such permission from the Commission as to these areas. According to Exhibit L2, a letter dated June 13, 1995 requesting additional

variances for these areas from Superintendent Dray to the Commission, sixty prisoners were then housed in nine day rooms, as described, but because of an increase in the number of "commitments" or prisoner intake obligations imposed on the Holding Center which caused the Holding Center to be "severely overcrowded" permission to house an additional thirty-three prisoners in these day rooms was sought by Dray. In his request, Dray specifically informed the commission that these thirty-three prisoners "will have to sleep on mattresses on the floor as no beds are available." As to the court hold rooms, the June, 1995 request informed the Commission that as many as seventy-three prisoners have been held in these rooms which Dray referred to as "bullpen[s]" explaining to the Commission that "[t]hey [the prisoners] are packed in" in these areas for seventy-two hours to one week. Plaintiff's Exhibit L2 at 2. Although at the hearing Dray was of the belief that the Commission had granted a variance for this increased level of housing in the day rooms, in a post-hearing stipulation dated August 2, 1996, Dray stated that while the Commission was "aware" of the June, 1995 request, it had, to date, not granted the requested variance.

In his testimony, Dray described the general conditions in the court hold rooms as "inhumane," a term which he said he had also applied to the same areas in the Holding Center a year ago. When asked to explain the basis for his opinion, Dray responded that he has "trouble with people eating, sleeping, and defecating in the same area." Dray maintained, however, that both the court hold rooms and the day rooms or dorms nevertheless complied with state and local fire safety requirements, and that the prisoners were given the same shower and recreational program opportunities as those individually housed in the linear and podular cell areas of the jail. Dray stated that unlike the court hold rooms, prisoners assigned to the gymnasium for housing actually "liked" being in that area. He also testified that while no staff provided cleaning service is provided for the court hold rooms or the day rooms, prisoners in these areas are given mops and buckets of cleaning solution with which to clean the floors of the rooms. Dray also stated that in the case of the court hold rooms the prisoners need only request immediate assistance for cleaning equipment in the event that a prisoner gets sick or may vomit on the floor of the room and cleaning equipment will be provided.

Dray further testified that while the current overcrowding at the Holding Center places additional stress on the guards as well as prisoners, that the level of security within the jail has remained adequate. Dray agreed that it is generally true that such overcrowding carries the potential for increased occurrences of altercations and violence among prisoners but maintained that the frequency of such incidents at the Holding Center has remained low. No specifics were provided by the parties regarding the frequency of assaults and fights among prisoners at the Holding Center. Dray further explained that the high costs associated with transporting and housing fees for prisoners which would be incurred if prisoners were sent from the Holding Center to other jail facilities within the state made it too expensive for the county to reduce the prisoner population at the Holding Center by arranging for such temporary housing elsewhere, which even if implemented, would also increase the logistical difficulty of bringing prisoners to scheduled court appearances. Therefore, as Dray testified, it is more cost effective for the county to pay for the additional overtime for the existing guards needed at the Holding Center to provide adequate security for the recent increases in the number of prisoners housed in the Holding Center under the described conditions.

Dray agreed that because of budget limitations on hiring more staff and the higher level of intake to the Holding Center, there could be delays in classifying prisoners immediately following their arrival at the jail based upon their physical and mental conditions and behavioral problems. This delay results in some prisoners who should be placed in more secure housing being housed with other pretrial detainees in the court hold rooms for periods longer than appropriate until these prisoners are properly classified and reassigned to a housing area within the jail where special medical or psychiatric

attention can be given. Dray agreed that because of the effects of overcrowding and budget limitations that it was difficult to provide prisoners clean laundry and blankets as frequently as he or the prisoners would prefer and that similar factors made it likely that prisoners assigned to the court hold rooms may not be able to take showers on schedule.

Joshua Rachuna testified that during his stay as a pre-trial detainee at the jail between July 28, 1996 and August 15, 1996 he was held in one of the court hold rooms for ten days and while there was assaulted by another larger prisoner who demanded Rachuna's food. Rachuna testified as a result of this confrontation that his nose was broken but that no action was taken by the guards to whom the assault was reported. Rachuna described the conditions in the court hold rooms as "unsanitary" and stated that the room "stank" from the odor of "rotting garbage." Rachuna said he became "nauseated" as a result of the bad odors and the congested conditions which required someone to sleep near the only toilet in the room which was used while prisoners were sleeping and eating. Rachuna also testified that the prisoners did attempt to clean the floor but that this was accomplished only every other day. Other than Rachuna's undocumented assault. Plaintiffs offered no other evidence of any major breakdown in security affecting the well being of prisoners as a result of the overcrowded conditions at the Holding Center.

Dr. Joseph Liebergall, a licensed psychologist for the past twenty-six years and Executive Director of Forensic Services at the Erie County Medical Center, testified. Dr. Liebergall provides mental health services for the local courts and mental health examinations and treatment to prisoners at the Holding Center, and has done so in over a thousand cases. Dr. Liebergall described the living conditions for prisoners in the court hold rooms at the jail as "toxic" and "unpleasant" as prisoners are forced to eat and sleep on the floors among strangers with no outside ventilation. According to Dr. Liebergall, other areas of the jail are "cleaner" and "less crowded" and thus "less degrading."

Liebergall stated that the difference between the housing conditions for prisoners in the court hold rooms and other areas of the jail is like "night and day" and that the living conditions in the court hold rooms are so poor that prisoners held in the rooms will feign suicidal behavior in order to effect a transfer to one of the mental health observation areas within the jail in order to avoid further confinement in the court hold rooms even though such transfer means that the prisoner may be required to remain nude while undergoing an extended period of observation and evaluation. Dr. Liebergall estimated that, of the 2100 referrals for mental health evaluation within the jail to his unit, as many as 20 per cent of the prisoners appear to him to claim to be suicidal "because of the conditions" in the court hold rooms. Liebergall estimated that over the past year, six to ten prisoners per week sought transfer from the court hold area to the suicide observation area of the jail to get out of these rooms.

Dr. Liebergall also testified that psychological research relating to confinement of prisoners indicates that there is a positive relationship between the ratio of the square footage of allocated living space per prisoner in a jail and the frequency of prisoner misbehavior as greater degrees of physical confinement correlate with heightened levels of prisoner anger and feelings of being victimized for relatively minor offenses. Dr. Liebergall stated that the constant dealing with prisoners in overcrowded conditions and "squalor" causes guards to become "callous" and indifferent to such conditions. According to Dr. Liebergall, the conditions for prisoners in the court hold rooms of the jail were so degrading that if the local SPCA maintained such conditions for the animals in its care, "it would be cited." Dr. Liebergall was not cross-examined by Defendants.

Richard Watroba testified that he spent three days in court hold room #5 at the Holding Center while awaiting sentence on a violation of state probation charge. Watroba described the living conditions in the court hold room as "rough" and "real bad," and that he "wouldn't want a dog to live there." Watroba stated that, in court hold room #5, he was forced to live with twelve persons in

an area measuring about ten feet by ten feet.[2] After being moved to court hold # 7, Watroba was forced to live with twenty other persons with one toilet which resulted that the prisoner who was required to sleep closest to the toilet being occasionally urinated upon by another prisoner attempting to use the toilet. Further, according to Watroba, who was a very credible witness, prisoners frequently got sick from drug withdrawals while in the court hold rooms with some vomiting on the floor, and that prisoners were constantly being stepped upon during their attempts to sleep on the floor mats because of the crowded living arrangements. When a prisoner got sick, cleaning supplies were provided to the other prisoners to effect the clean up. Watroba, who also worked in the jail laundry, also stated that there were insufficient clean towels available to prisoners in the court holds because of inadequate supplies and that as a result some prisoners actually felt cleaner not taking showers rather to have to dry off using their soiled clothing from living on the dirty floors of the court hold rooms. Watroba stated that prisoners assigned to the regular cell areas within the jail got "better stuff." Watroba further testified that because of other "stinky" and "sick" prisoners constantly "yelling for drugs" and vomiting on the floor almost daily, other prisoners, like himself, "didn't want to sleep," while housed in the court hold rooms.

Anthony Lee, who had been convicted of armed robbery and was awaiting transfer to a state penal facility, testified that he recently spent two weeks in one of the court hold rooms at the jail. Lee testified that he was also required to sleep on the floor on a mat and that showers were not regularly provided or made available so early in the morning that many prisoners were still asleep making it difficult to wake up and shower. Lee also described the room as so full of "bugs" that prisoners constantly became sick. Lee stated that the odor in the "bull pens" was so bad that "it was like a dead body" and that with the room temperature being so cold he "could not sleep but only tossed and turned."

Lee was subsequently transferred to a cell in one of the podular areas which he described as more clean and comfortable." Lee further testified that while in the podular unit a jail guard threatened him with being sent back to the "bull pen" if he failed to comply with an order.

Deputy Sheriff Richard Canazzi, who is one of the guards regularly assigned to the court hold rooms, testified that all prisoners in the court hold rooms are given daily the chance to shower and that, while clean towels are not always available thereby requiring the prisoners to use bed sheets and t-shirts to dry off, no prisoner is forced to use their clothes for drying. Canazzi also stated that the area experienced only a "few" fights among prisoners in a given month and that the garbage bag in the rooms is removed and replaced twice each day. Further, the deputy explained that if the toilets in the rooms should for any reason become plugged, upon this problem being brought to the attention of the guards by the prisoners, the condition is promptly fixed. He also stated that the toilets in the court hold rooms are cleaned daily. Canazzi could not recall receiving any complaints that prisoners were being urinated upon while sleeping in the court hold rooms. Canazzi also estimated that a new prisoner would stay in the court hold rooms for one to five nights as an average, with about ten percent or less staying two-three weeks, and only rarely for one month or longer. Canazzi also explained that as a prisoner goes to court, he will be given a fresh change of clothes and upon returning a fresh bed sheet and a pillow case, however, pillows are not assigned.

Mr. Don Colpoys testified that he has served as recreation director for the Holding Center for ten years and that the prisoners in the court hold rooms like the prisoners throughout the jail are given the opportunity for scheduled recreational activity on a regular basis in either of two areas within the jail, one on the seventh floor and the other on the roof. These areas have exercise equipment and a volley ball court. In cold weather,

2. According to Exhibit L8, court hold # 5 is eleven feet by sixteen feet; court hold # 7 measures twenty-one feet by eighteen and one-half feet. Court hold # 6 is eight feet by fourteen and one-half feet.

prisoners are supplied with jackets although the number of prisoners using the outdoor recreational area during the winter months is much lower than the warmer months. The Holding Center's gymnasium, Colpoys explained, is not presently available for recreation as it is presently used, as noted, for prisoner housing.

### DISCUSSION

For a court to issue a preliminary injunction pursuant to Fed.R.Civ.P. 65, the moving party must demonstrate, by a preponderance of the evidence, (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Spear, Leeds & Kellogg v. Central Life Assurance Co.,* 85 F.3d 21, 25 (2d Cir.1996); *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991).

■ In an application seeking to change prison conditions, " 'appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief,' particularly when it comes to requesting a state's administration of its own facilities, including it schools and prisons." *Dean v. Coughlin,* 804 F.2d 207, 213 (2d Cir.1986) (quoting *Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976)). Therefore, out of deference to the state's judgment on how to administer its prisons, an application of the less rigorous standard is inappropriate. *Davidson v. Scully,* 914 F.Supp. 1011, 1014 (S.D.N.Y.1996). Thus, before the court can consider granting an injunction, the plaintiffs must demonstrate irreparable harm and a likelihood of success on the merits. It is well settled that an allegation of a violation of a constitutional right under the Eight Amendment challenging conditions of confinement in a prison creates a presumption of irreparable harm potentially justifying equitable relief. *Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir.1996); *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984); *Pinckney v. Board of Education,* 920 F.Supp. 393, 400 (E.D.N.Y. 1996).

■ In this case, Plaintiffs, on behalf of themselves and the certified class claim violations of both the Eighth Amendment prohibition against cruel and unusual punishments and their right, as unconvicted persons, to be free of any punishment without due process of law, guaranteed by the Fourteenth Amendment, in the form of a conviction and sentence by a court. If, therefore, the court finds that plaintiffs have met their burden for preliminary relief as to any of the challenged conditions at the Erie County Holding Center on the alleged Eighth Amendment claim it will have also found a viable claim under the Fourteenth Amendment due process clause. If the court were to find an insufficient basis for the Eighth Amendment claim it would nevertheless be required to determine whether the conditions at issue constituted a punishment as to unconvicted detainees. Thus, while the ultimate issues in this case are closely related they are not identical.

The Eighth Amendment provides in relevant part that "cruel and unusual punishments [shall not be] inflicted." The Supreme Court has held that the prohibition is to be interpreted in a "flexible and dynamic manner" and that although a particular punishment to be prohibited need not be considered as "physically barbarous" it must nevertheless "involve the unnecessary and wanton infliction of pain" or be "grossly disproportionate" to the severity of the crime. *Rhodes v. Chapman,* 452 U.S. 337, 345–46, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (citations and internal quotation marks omitted). The court considers as unnecessary and wanton those inflictions of pain which are "totally without penological justification." *Rhodes, supra,* at 346, 101 S.Ct. at 2399 (citing *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859 (1976)). No "static test" exists for the determination of whether a challenged punishment is cruel and unusual, rather, the courts "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes, supra,* 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Trop v. Dulles,* 356 U.S. 86,

101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)).

■ However, the Eighth Amendment does not "mandate comfortable prisons," *Rhodes* 452 U.S. at 349, 101 S.Ct. at 2400, and "only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399–2400). Thus, courts "must proceed cautiously in making an Eighth Amendment judgment because, unless reversed by the Court, '[a] decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment'" and thus "'[r]evisions cannot be made in the light of further experience.'" *Rhodes, supra,* at 351, 101 S.Ct. at 2401 (quoting *Gregg v. Georgia, supra,* 428 U.S. at 176, 96 S.Ct. at 2926–27).

■ Further, "[i]n assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'" *Rhodes, supra,* 452 U.S. at 351, 101 S.Ct. at 2401 (quoting *Bell v. Wolfish,* 441 U.S. at 539, 99 S.Ct. at 1874). Applying these criteria, the Court in *Rhodes* found no violation of the Eighth Amendment where the challenged confinement condition was that two prisoners were forced to share, as a result of serious overcrowding, a single cell provided sixty-three square feet of living space in a correctional facility that otherwise provided adequate living conditions.

In *Wilson, supra,* the Supreme Court held that in addition to showing a serious violation of minimum standards of daily living requirements, an objective standard, an Eighth Amendment claimant must also establish that the prison officials acted with the knowledge and intent, a subjective requirement, that the challenged condition, not imposed as part of the sentence of punishment, inflicted pain on a prisoner so as to constitute a wanton infliction of pain. *Wilson, supra,* 501 U.S. at 300–301, 111 S.Ct. at 2325–2326. In *Wilson,* the Court specifically held that in order for responsible officials to be found to have been guilty of wanton infliction of pain through the maintaining of inadequate conditions of confinement, the officials must be shown to have acted with "deliberate indifference" to the conditions claimed to be "inhumane." *Wilson,* at 303, 111 S.Ct. at 2326–2327.

■ Further, in scrutinizing the challenged condition, a court is "under an obligation to examine the *actual effect* of challenged conditions upon the well-being of the prisoners." *Rhodes,* 452 U.S. at 367, 101 S.Ct. at 2410 (concurring opinion of Brennan, Blackman and Stevens, JJ.) (emphasis in original). "In determining when prison conditions pass beyond legitimate punishment and become cruel and unusual, the 'touchstone is the effect upon the imprisoned.'" *Id.* at 364, 101 S.Ct. at 2408 (*quoting Laaman v. Helgemoe,* 437 F.Supp. 269, 323 (D.C.N.H.1977)). However, in assessing whether the responsible officials may be found to have acted with the required subjective element of wantonness, the effect upon the prisoner is not controlling, rather, the question "depends upon the constraints facing the official" *Wilson, supra,* 501 U.S. at 303, 111 S.Ct. at 2326.

The Supreme Court recently held that to find that a prison official acted with deliberate indifference to a challenged condition of confinement under the Eighth Amendment, it must be shown that the official had knowledge of and disregarded "an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). While financial constraints may not in themselves immunize an official from an Eighth Amendment violation, *Albro v. Onondaga County,* 681 F.Supp. 991, 996 (N.D.N.Y.1988) ("economic factors may not be cited as basis for continued imposition of hardships and privations" upon prisoners), fiscal constraints beyond the control of responsible officials may be relevant to the

issue of the intent required for a constitutional violation, if asserted as defense. *Wilson, supra,* 501 U.S. at 301–302, 111 S.Ct. at 2325–2326.

■ Under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee held in state custody has no right to be "free from discomfort" but does enjoy the right to be free from being subjected to conditions of confinement while awaiting trial which "amount to punishment," *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979), as "[u]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* In assessing whether a challenged nature or condition can be considered as inflicting punishment the Court in *Wolfish* stated

> Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

*Wolfish, supra,* at 539, 99 S.Ct. at 1874.

In *Wolfish,* the Court, in rejecting the notion that due process included a "one-man, one-cell principle," also pointed out that

> ... confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process clause as to whether those conditions amounted to punishment....

*Wolfish, supra,* at 542, 99 S.Ct. at 1875–76.

However, the Court found no federal due process violation where two pretrial detainees were locked in a cell, between 11 P.M. and 6:30 A.M. and during brief periods for the day for headcounts, having a total space of approximately seventy-five square feet with two bunk beds, an uncovered toilet and a wash basin, and where during the rest of the day they were allowed to move about their rooms and common areas.

In *Wolfish,* the detainees were nearly all released within a sixty day period. As the Court said, "[w]e simply do not believe that requiring a detainee to share toilet facilities and this admittedly small sleeping place with another person for generally a maximum period of 60 days violates the Constitution." *Wolfish* at 543, 99 S.Ct. at 1876. In *Wolfish,* the challenged conditions which included severe overcrowding and inadequate recreation involved a new facility in which prisoners were housed in modular units allowing access to common area day-rooms for substantial periods of the day. Also, in *Wolfish,* some of the newly arrived prisoners were assigned to sleep on "cots" located in common areas until a cell became available. *Wolfish* at 526, 99 S.Ct. at 1867. The Court noted that both sentenced and pretrial detainees were subject to the conditions but less than one-half of the detainees were required to be "double-bunked." *Wolfish* at 525 n. 4, 99 S.Ct. at 1867 n. 4.

In *Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981), decided two weeks before *Rhodes v. Chapman,* the Second Circuit noted that *Wolfish* established a "stringent test for determining when overcrowding will amount to punishment." *Lareau, supra,* at 103. In upholding an injunction directed towards some of the challenged conditions at the Hartford Connecticut Community Holding Center, the court stated that for a due process violation to be found "[i]t must be shown that the overcrowding subjects a [pretrial] detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau, supra,* at 103. The court looked to whether the hardships inflicted by the conditions were reasonably related to any legitimate governmental objective including ensuring a detainee's presence for trial, maintaining security and order, and any measure having the tendency to promote efficient management of the detention facility. *Lareau, supra,* at 104. The court rejected as a justification for the hardships the "state's interest in housing more prisoners

without creating more prison space." *Lareau, supra,* at 104.

Applying this standard, the court found that the housing of nine prisoners in an all-purpose day room converted into a "dormitory," who were required to sleep on mattresses on the floor of the room which was so confining that the "inmates had to crawl over one another to reach the single toilet provided them" violated the prisoners' due process rights. *Lareau* at 99–100. With that number of prisoners, the "fishtank," as the room was called, provided less than twenty-three square feet of living space per prisoner. *Lareau, supra,* at 107. The other day-rooms at the Hartford Holding Center, ranging in size from 225 to 262 square feet, were used to provide eating and light recreational space for prisoners. The prisoners were "double-bunked" (*i.e.* two prisoners were required to sleep in a cell intended for one) in adjacent cells each providing sixty to sixty-five square feet of space, an area further reduced when a mattress for a second prisoner was placed on the floor of the cell to about thirty-six to forty-one square feet of space for both prisoners. *Lareau, supra,* at 99. Fifteen to twenty prisoners and sometimes as many as twenty-four prisoners at a time used these day rooms. *Lareau, supra,* at 99–100. Holding that the length of time a prisoner is exposed to a challenged condition must be considered in deciding whether the condition is unconstitutional, the court in *Lareau* limited confinement in the overcrowded cells and day rooms to thirty days for convicted persons and fifteen days for pretrial detainees. *Lareau, supra,* at 105. As to the conditions in the "fish-tank," the court stated that "the use of fishtank [and] floor mattresses …, however, are too egregious to warrant any such leeway" and that "[t]hey constitute punishment without regard to the number of days for which a prisoner is so confined." *Lareau, supra,* at 105. Regarding the fishtank, the court also observed that "forcing men to sleep on mattresses on the floors does not provide minimum decent housing under any circumstances for any period" except in the case of a "true emergency such as fire or riot." *Lareau, supra,* at 107–108. The strength of the Second Circuit's view on this issue is reflected in its *sua sponte* order of a "blanket prohibition … against the quartering of inmates on mattresses on cell floors." *Lareau, supra,* at 109.

The court also found that the prisoners assigned to the double-bunked cells and connected day-rooms were subjected to "extremely overcrowded" conditions, forcing inmates to sit on the floor to eat because of lack of table space. *Lareau, supra,* at 104. The court further stated that "when a detainee is subjected for a substantial length of time to the combination of double-bunked cells, overcrowded day-rooms and strained prison services at the HCCC, he is being unconstitutionally punished." *Lareau, supra,* at 105. At the time of the trial, the Hartford facility was being used to house 548 prisoners, 40 percent over the designed capacity of 390. *Id.,* at 99. Three-fourths of the inmates were pretrial detainees and 67 percent were held in the overcrowded conditions for more than sixty days. *Id.,* at 101–102.

Turning to the question of whether the overcrowding and practice of double-bunking at the Hartford facility violated the Eighth Amendment rights of sentenced prisoners, the court in *Lareau* noted that the amount of square feet of living space available to prisoners at the facility was substantially less than the minima recommended by various professional groups, which ranged from eighty square feet per prisoner for those held continuously in a cell for more than ten hours per day to not less than fifty square feet of any confined sleeping area. *Lareau,* at 106–107. Relying on the Supreme Court's statement in *Wolfish* that these recommendations do not "establish the constitutional minima," but "may be instructive in certain cases," 441 U.S. at 543 n. 27, 99 S.Ct. at 1876 n. 27, the court found that the combination of overcrowding in the cells and the related day rooms together with the resultant curtailment of services and inadequate security found to exist at the Hartford facility violated the Eighth Amendment rights of sentenced prisoners when imposed for any period in excess of thirty days. *Lareau, supra,* at 108–109.

■ Applying these principles to the case at hand, the court finds that Plaintiffs have met their burden to show a likelihood of success as to the confinement of sentenced prisoners and pretrial detainees in the court hold rooms, the day rooms, the Bravo level resource room, the atrium and chapel at the Holding Center. In the case of the court hold rooms and day rooms, the court finds that the combined effects of severe crowded daily living conditions, lack of adequate toilet facilities and prisoners living in locked down status constitutes both wanton infliction of pain and unjustified punishment. In the case of these areas and the atrium, chapel and resource room, the use of mats for sleeping on floors by prisoners violates both their Eighth Amendment and due process rights.

As to the court hold rooms, the preponderance of the credible evidence shows that when the largest of these rooms, Court Hold # 7, is used it often houses ten to twenty prisoners with only one toilet, requiring all of the prisoners to use but one toilet. As noted, court hold room # 7 measures twenty-one by eighteen and one-half feet or about 388 square feet. Assuming occupancy by fifteen prisoners, a number supported by the record, the space provides about twenty-six square feet per prisoner, similar to the degree of excessive crowding condemned by the Second Circuit in *Lareau*. This results in some prisoners being subjected to being stepped on and urinated upon while sleeping, exposure to other prisoners defecating in the only available toilet while prisoners are taking meals seated on the floor, vomiting on the floor and in the toilet by prisoners who become sick and noxious odors caused by a combination of too many people in too little space. The crowded conditions at the Holding Center have admittedly forced the Defendants to curtail the availability of the jail's indoor gymnasium as an exclusively recreational area thus requiring the use of an outdoor area on the roof of the jail. While providing all prisoners with coats to enable them to tolerate the low temperature of the winter months and granting a daily recreational opportunity to all prisoners, the Defendants' own evidence shows, not surprisingly, a much lower level of use of the recreation period during the cold weather months. Moreover, unlike the podular cell areas, persons held in the court hold rooms, who are locked in at all times, have no access to connected common area or day-room activity area for light recreation or taking meals while seated at tables. Thus, the limited opportunity for recreation provided at the Holding Center does not sufficiently mitigate the deprivations of daily living requirements created by forced housing in the court hold and day rooms.

The effect upon the prisoners who are confined in the court hold rooms is objectively severe. Dr. Liebergall described numerous instances where prisoners feigned suicide symptoms in order to be placed in the mental health evaluation unit notwithstanding its attendant requirement that prisoners are held in nude conditions as a special security measure. Moreover, the evidence shows that as a result of the cramped quarters, cold temperatures in the room, bright lights, bad odor and noise—all factors attributable to the overcrowded condition—prisoners have difficulty sleeping properly in these rooms, a basic daily living requirement.

Also, the Second Circuit has directly held that forcing pretrial detainees to sleep on the floor on mattresses in a jail cell violates the due process clause without regard to the length of such a condition of confinement. The extremely confined living space in the court hold rooms causes prisoners to feel ill from exposure to bad odors and open toilets, so much so that many feign mental illness to obtain transfer for medical observation. Defendants have failed to assign a valid governmental objective that is reasonably related to the requirement that pretrial detainees be exposed to such conditions. Indeed, there is evidence that some guards at the Holding Center perceive housing in the court hold rooms as punishment. Based upon this record, the court finds that Plaintiffs have demonstrated a likelihood of success at trial on the issue of whether the condition in the court hold rooms for pretrial detainees violates their due process rights under the Fourteenth Amendment.

The weight of the credible testimony and other evidence plainly establishes that the

conditions in the court hold rooms deprives prisoners of essential requirements of daily life without any corresponding justification reasonably related to a valid penological or other institutional interest serving the facility's purpose of detaining accused persons for trial. By any measure of comparison, the space provided in the court hold rooms is substantially less than the minima promulgated by the state Commission of Corrections in accordance with its mandate under a state statute. While these minima, like those suggested by various professional organizations, do not define the minimal requirements for federal constitutional purposes, the fact that Defendants seek to comply with them as standards necessary to the protection of health, safety and security of the prisoners in Defendants' Holding Center, is persuasive evidence that the conditions presently under review do not adequately provide for the necessary requirements of daily living for the prisoners housed in the court hold rooms, and therefore constitute a basis to find a violation of the Eighth Amendment as to sentenced prisoners who may be housed in the court hold rooms.

For example, Plaintiffs' Exhibit E is a copy of a directive from the Commission of Corrections to Defendants Higgins and Dray, and the County Executive and County Attorney of Defendant Erie County dated June 30, 1994. The directive states that the Commission had recently conducted site visits to the Holding Center and found the overcrowded conditions to be in violation of Section 7040.3 of its regulations which prohibits confining inmates in a corrections facility in excess of the maximum capacity of the facility which at that time was established at 596 "beds." Further, the Commission found the Holding Center in violation of Section 7040.7 of its regulations prohibiting housing inmates in the court hold "pens" which were unapproved by the Commission. The Commission noted it had brought these violations to the attention of Sheriff Higgins, a Defendant, and other officials in a series of meetings held in 1994 but that the officials, including Defendants Higgins and Dray, had "failed to remedy the deficiencies of their own accord." The Commission directed compliance with its regulations and specifically ordered Defendants

to "depopulate" the "court holding pens" and house inmates in those areas in accordance with its regulations on minima housing requirements for inmates.

Approximately nine months after Superintendent Dray had requested a variance from the Commission to increase the number of prisoners allowed to be housed in the day room dormitory areas, a request which was never approved, the Commission wrote to the Erie County Executive in February, 1996, that the Holding Center was housing "well over 800 inmates in a building designed to hold no more than 650" and that the author, Paul Shechtman, the Commission's Director of Criminal Justice, found that conditions at the Holding Center "are not ones consistent with State regulations or acceptable for the safety, security and health of staff or inmates." Exhibit L 3. The Commission again wrote to the County on May 21, 1996 pointed out that as of May 17, 1996, the inmate population at the Holding Center was at 814, "135 above the population cap imposed at the Holding Center by the Commission. At this crowding level, all of the most egregious conditions of confinement which originally prompted the Commission's Directive [limiting the Holding Center's capacity to 679 inmates] pertain." Letter from Edmund B. Wurtz, Commission Chairman to Deputy County Executive James P. Keane. Exhibit M. Although this communication does not specify whether it is intended to apply to all areas of the Holding Center, based on the record, it is reasonable to apply it to at least the court hold areas and day rooms.

The testimony of the prisoners credibly described what Superintendent Dray himself acknowledged to be "inhumane" conditions in the court hold rooms including ten to twenty prisoners—locked-in twenty-four hours a day—in insufficient space, forced to eat on the floor on mattresses and sharing one exposed toilet for periods of up to one month. The resulting complete absence of privacy, interference with sleep, constant exposure to dirt and residue from sick prisoners, potential for contact with prisoners having infectious diseases, and exposure to noxious odor from human waste and rotting food occurring

in a highly confined space for a substantial period of time all demonstrate that Plaintiffs have a strong likelihood of success on their Eighth Amendment claim with respect to serious deprivation of daily living requirements unrelated to any legitimate objective for pretrial confinement in the court hold areas.

As to the other areas of the jail including the day rooms and the atrium, chapel and resource room, the court finds that, based upon the Second Circuit's decision in *Lareau,* Plaintiffs have established a likelihood of success in demonstrating that requiring prisoners to sleep on mattresses on the floor of cells in these areas, also constitutes a denial of due process. In the case of prisoners assigned to the day room dorm areas, the confined nature of these spaces, the lack of any modicum of personal privacy, and unsanctioned deviation from the state's own minimum housing standards for incarcerated persons for the additional prisoners added to these areas without the approval of the state Commission, warrants extending the prohibition against sleeping on mattresses imposed in *Lareau* to these areas. Although these areas like the court hold rooms are not physically speaking traditional jail cells, the absence of access to day activity rooms for prisoners in the linear days rooms, the chapel, and the resource room, who are always locked down, and the requirements that all prisoners housed in these so-called "dorms" use a single toilet, demonstrates that the day rooms are actually worse than housing in the regular cells in the jail. In the podular areas, prisoners assigned to the cells not only sleep on beds and take meals and light recreation at tables, but also have use of a private toilet. For those in the single linear cells there is also some privacy and individual toilet facilities. For those in the day room dorms, the resource room and chapel, neither is made available.

The testimony of prisoner Lee, a convicted felon, clearly establishes that housing in the regular cell area is substantially better than in the court hold rooms. Based upon the court's own observations, the same can fairly be said about the daily living conditions for the prisoners assigned to the days rooms.

The same conclusion applies to the use of the chapel and atrium in which, although less confining in available physical living space than the day rooms, nevertheless prisoners are compelled to sleep upon the floor upon mattresses in these areas, a requirement which the Second Circuit found "egregious." Except as to the atrium, prisoners were also locked in at all times in the resource room and chapel without access to any common area or toilet facilities. Although the atrium is not always secured, the lack of access to any common area for prisoners housed there and their relative distance from toilet facilities, makes it sufficiently like a jail cell to warrant application to *Lareau's* prohibition on the use of floor mats.

While a harsh condition, like forced living on the floor of cells or cell-like areas, may not alone support a violation, it may when considered in combination with another condition. The presence or absence of access to a true day-room for meals and light recreation can ameliorate the demonstrated negative effects upon prisoners of a highly restrictive living area for at least a limited period. Here, there is no provision for such ancillary space for the prisoners confined in these areas, thus, the severely limited living space available and the requirement of sleeping on floor mats becomes, as in the case of the court hold rooms, the basis for a due process and Eighth Amendment violation in the atrium, chapel and resource room areas of the Holding Center as to the continued requirement of forcing prisoners to sleep on the floor on mats.

As to the use of the Holding Center's gymnasium for housing prisoners, while it may be arguable that the bedding of prisoners on the floor in that area also violates the holding in *Lareau,* the evidence shows that prisoners in this area are confined in an area measuring forty-three by fifty-eight feet providing approximately fifty square feet of space per prisoner. Part of the gymnasium is also used for tables and chairs constituting a large common area. There is reasonable access to two private toilets facilities. Significantly, there was no testimony from any witness suggesting any adverse effect upon the daily living requirements of those prison-

ers assigned to this area. For example, prisoners assigned to the gym share the use of two toilets, located in nearby lavatories which do not expose the other prisoners to human waste, odors or noise while sleeping or while taking meals when the toilets are in use. Further, Dr. Liebergall's testimony concerning the extreme efforts by some prisoners to avoid incarceration in the court hold rooms did not extend to housing in the gymnasium. Moreover, these prisoners are given an opportunity for daily outdoor recreation which, if utilized, can somewhat ameliorate the effects of the group living arrangement in the gymnasium. Prisoners there, as elsewhere in the jail, also have access to the prison library, and there was no evidence presented suggesting these or any prisoners assigned to the linear or podular cells do not receive adequate medical care, food or other basic necessities.

■ Further, while the living conditions in the gymnasium and other areas may create added strain on guards, there was no evidence that security in the Holding Center is generally inadequate or that there is a serious risk of harm to prisoners as a result of the additional burden placed on the guards associated with the general overcrowded conditions which prevail in the Holding Center. Accordingly, based on the present record, the court finds that Plaintiffs have not established a likelihood of success as to their Eighth Amendment or Fourteenth Amendment claims as to the present confinement in the gymnasium, nor does the court find that the direction of the Second Circuit prohibiting use of mattresses for prisoners sleeping on the floors of cells is, on this record, applicable to this area of the Holding Center. Significantly, the minimum living areas granted prisoners at the Erie County Correctional Facility are substantially better than that provided prisoners in these areas of the Holding Center.

In sum, the excessively restrictive living areas provided in the court hold rooms and day rooms deprive prisoners of the necessities of daily living without justification in relationship to any reasonable penological objective or purpose of pretrial confinement. As a result of Defendants' failure to provide more reasonable daily living conditions, these makeshift housing areas are unnecessarily severe and provide the basis for finding that they constitute, as to sentenced prisoners, a cruel and unusual punishment and as to pretrial detainees, an arbitrary form of punishment without due process.

As to the Plaintiffs' claim of cruel and unusual punishment for sentenced prisoners, the evidence shows that, as with pretrial detainees confined in the court hold rooms, Plaintiffs have shown a likelihood of success that confinement in these areas constitutes a deprivation of the minimum requirements of daily living thereby inflicting pain without regard to any advancing valid penological objectives. Accordingly, as discussed, preliminary relief shall also be granted against the confinement of sentenced prisoners on floor mats in these areas. Further, as in *Lareau*, the use of such a confined area providing prisoners with only one exposed toilet for the use of as many as fifteen persons or more without any access to a dayroom for the taking of meals or light recreation satisfies Plaintiffs' burden on their Eighth Amendment claim. In *Lareau*, the court refused to enjoin housing of a prisoner in area providing thirty square feet of living space in double-bunked cells where the prisoner had access to other areas such as a dayroom, albeit a crowded one, library and, on a limited basis, a gymnasium provided that such housing did not exceed thirty days for sentenced prisoners and fifteen days for pretrial detainees. Plaintiffs have, therefore, shown a likelihood of success as to their Eighth Amendment claims for sentenced prisoners held in the court hold rooms and the day rooms at the Holding Center, areas without access to any common area to ameliorate the effects of living in the severely restrictive housing conditions without adequate toilet facilities in these areas.

■ In *Lareau*, the court found that requiring as many as nine prisoners to share one toilet in one small room was prohibited by both the Eighth Amendment and due process considerations, but approved one toilet for two prisoners who were double-bunked in a cell who also had access to an additional toilet located in the adjacent day-

room shared by up to twelve prisoners. Here, the access by prisoners to a full range of physical recreation such as the use of the gymnasium is limited by the fact that the gymnasium is also used for temporary housing. The evidence shows that all prisoners are given daily opportunities for outdoor physical recreation, but this recreation is, however, effectively limited in the colder months. Therefore, the limited recreational opportunity does not sufficiently ameliorate the adverse effects of prolonged confinement in the court holds and day-rooms areas, nor does it overcome the lack of adequate toilet facilities and the ability of the prisoner to eat his or her meal from a table rather than while seated on a bed or the floor in close proximity to an exposed toilet which may be used at the same time, in the court hold rooms and day rooms.

Although *Rhodes v. Chapman* held that requiring more prisoners to sleep in a cell beyond its design capacity is not necessarily unconstitutional, the Court also required that other conditions of confinement favorably effect a prisoner's daily living be considered. Here, the day rooms house prisoners in an area which, like the court hold rooms, was not originally intended for housing prisoners. The available living space for prisoners housed in these areas is substantially below the minima established by the Commission. For example, the day room on the Alpha level provides approximately thirty-five feet of space per prisoner; the day room on the Bravo level provides fifty-nine square feet; on the Echo level, the two day rooms are severely cramped, allowing only sixteen square feet per prisoner. In the Echo day rooms, as many as fifteen prisoners are required to share one toilet. Two day rooms on the Foxtrot level provide forty-three square feet per prisoner; two other rooms provide approximately twenty-four square feet per prisoner. As noted, for multiple housing of prisoners, the Commission requires a minimum of fifty square feet of sleeping space, with one toilet, shower and sink for each eight prisoners along with an adjacent common area or day room.

Thus, the record supports the finding that exposure to adverse living conditions created by housing prisoners in the court hold rooms and day rooms creates a risk of serious harm to the health and safety of prisoners confined to these areas based on the deprivation of daily living requirements of an adequate place to sleep, eat and the use of inadequate toilet facilities.

The court also finds that Plaintiffs have sustained their burden on the subjective requirement that Plaintiffs establish that Defendants acted with deliberate indifference to Plaintiffs' rights, prerequisite for preliminary relief as to the confinement of prisoners in the court hold areas and day rooms. As the correspondence between the state Commission of Corrections and Defendants demonstrates, Defendants have been well aware that the conditions now challenged have existed as to the court hold rooms at least since June, 1994 and as to the day rooms since Defendants requested a variance from the Commission's requirements in June, 1995 in order to increase the number of prisoners housed in the day room dormitories. Although the record does not indicate precisely when the use of the court hold rooms for housing pretrial detainees was commenced, Superintendent Dray testified that serious overcrowding problems at the Holding Center have existed at least since 1989. Superintendent Dray also acknowledged that the record does support the finding that prisoners at the Holding Center have been so confined since well before any of the Plaintiffs were incarcerated at the jail. Indeed, in recent correspondence from the Commission to the Defendant County of Erie the Commission threatened to seek "judicial intervention" if the county failed to expeditiously propose a plan to "address the problem [of conditions at the Holding Center]." Exhibit L 3. Such evidence provides a basis for the finding that Defendants therefore had knowledge that the highly restrictive living conditions in violation of state regulations had the capability of inflicting punishment without trial in violation of the Due Process Clause and that their failure to act deprived prisoners of a requirement of daily life without penological justification thereby causing a wanton infliction of pain constituting a cruel and unusual punishment. Significantly, Dray himself had described conditions in the court

hold rooms as "inhumane" a year ago. In a partial explanation for the cause of the overcrowding, Defendants stated that they were required by state law to accept any persons who because of their convicted or parole violation status should have been transferred to a state facility thereby contributing to the overcrowding at the Holding Center. However, like the argument that a defendant was prevented from corrective action because of a lack of available funding, such a rationale for inaction if accepted as a defense would always render a prison or jail official exempt from liability on an Eighth Amendment or due process violation claim. In any event, Defendants do not contend that such a statement of causes or lack of funding negates a finding of the subjective element of Plaintiffs' due process or Eighth Amendment claim. *See Wilson v. Seiter, supra,* 501 U.S. at 301, 111 S.Ct. at 2325–2326. Rather, the record supports a finding that Plaintiffs have shown a likelihood of success on whether Defendants' acted with deliberate difference to Plaintiffs' rights. The evidence shows Defendants had knowledge of serious risks to the health, safety and daily living requirement of prisoners housed in the court hold rooms and day rooms and failed for over two years to take action to avoid it.

The remaining questions which under, *Rhodes* and *Lareau,* must also be answered is, assuming bunk beds or cots are provided to all prisoners in these areas, what, if any, limits on occupancy and the duration of confinement have Plaintiffs demonstrated should be placed on the Defendants housing of prisoners in these areas. Plaintiffs did not present any expert testimony directly relating to serious threats to the health or safety of prisoners in these areas. However, courts are entitled to use "common sense" and "observation" in addressing these issues. *Rhodes,* 452 U.S. at 367 n. 16, 101 S.Ct. at 2410 n. 16 (concurring opinion). Here, the Defendants have acknowledged that the Commission standards are to be followed and any deviations therefrom in the housing of prisoners under their care and custody must be approved in the form of variances granted by the Commission. The court finds the Commission's minimum standards for housing prisoners in multiple occupancy circum-

stances, or fifty square feet per prisoner, with a minimum of one toilet and sink for each eight prisoners to be a reasonable requirement to provide minimum requirements of daily living for any prisoner in the Holding Center to be confined either as sentenced prisoners or pretrial detainees. While these standards do not in themselves necessarily a constitutional requirement, they do serve to instruct the court on what minimum housing requirements are needed to protect prisoners against constitutional deprivations in the particular circumstances of the Holding Center. To hold a convicted person or pretrial detainee in an area affording living space about five feet by ten feet sharing access to a common toilet with seven other persons is fairly spartan. In practical effect, it will, however, and in conjunction with the prohibition against use of mats for sleeping in these areas, undoubtedly result in reducing the number of prisoners assigned to the court hold and day rooms.

The question of what period, if any, of time Defendants may house prisoners in either the court hold rooms or day rooms without complying with these requirements is a more difficult question. In *Lareau,* the court established, under the particular facts, maximum limits of thirty days for sentenced prisoners and fifteen days for pretrial detainees. But those limits were established under circumstances where the prisoner, although confined in sleeping areas with less than fifty square feet, had access to an adjacent day room. Here, the prisoners assigned to these areas do not have access to any common living areas. Indeed, those in linear section day rooms are locked-in at all times and in the other areas for substantial periods of time during the day.

Considering all of the relevant factors, the court finds that for any prisoners to be confined to the court hold rooms or the day rooms, no prisoner whether a pre-trial detainee or sentenced prisoner may be held without being given a suitable bed, either a reasonably comfortable bunk bed or cot, along with suitable bedding and a blanket. Additionally, in the atrium, chapel and resource room, housing prisoners on mats is prohibited.

Except in the case of true emergencies as described in *Lareau,* housing of sentenced prisoners in the court hold rooms or day rooms for sleeping and daily living may be permitted without adhering to the minimum living space and related toilet facility requirements stated in this decision for no more than a total of five days, except in the case of a true emergency; for pretrial detainees any confinement to these areas absent compliance with the above requirements which exceeds in total twenty-four hours will constitute a violation of their rights to due process, except in the case of a true emergency.

Although the court has the authority to immediately enjoin any confinement of prisoners at the Holding Center which fail to comply completely with the requirements established in this decision, the Supreme Court has recently encouraged courts to provide prison officials found to maintain unconstitutional confinement conditions with a reasonable opportunity to "rectify" a violation before an injunction is entered. *Farmer, supra,* 511 U.S. at ——, 114 S.Ct. at 1984.

During the hearing on Plaintiffs' motion, the court has been made aware of Defendants' efforts to resolve the issue of overcrowding at the Holding Center through litigation against the state in the New York Supreme Court thereby manifesting an apparent intention to seek resolution of the problem. Based on this information, and the practical problems which Defendants would necessarily encounter in effecting immediate compliance with this decision, the court finds Defendants should be given a reasonable opportunity to rectify the confinement conditions, determined here to be subject to preliminary relief, before entry of a formal order. Accordingly, entry of a formal preliminary injunction in accordance with the foregoing will be stayed for a period of sixty days to permit Defendants to achieve voluntary compliance with the requirements for confinement of prisoners at the Holding Center as determined by this decision.

## CONCLUSION

Plaintiffs' motion is GRANTED in part, and DENIED in part. The parties shall meet with the court on October 28, 1996 at 2:00 p.m. to schedule further proceedings in this matter.

SO ORDERED.